**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TREVOR PAYTON, LATASHA PAYTON, and TERESA PAYTON, <br><br>              Plaintiffs, <br><br>       v. <br><br> CITY OF CHICAGO, LUIS PELAYO, and EDGELY RIFE, <br><br>              Defendants. | No. 1:19-cv-08498 <br><br> Hon. Judge Charles P. Kocoras <br><br> Hon. Magistrate Judge M. David Weisman <br><br> **JURY TRIAL DEMANDED** |

<u>**THIRD AMENDED COMPLAINT**</u>

      Plaintiffs Trevor Payton, Latasha Payton, and Teresa Payton (collectively, "Plaintiffs"), by and through their attorneys, Latham & Watkins LLP, for their Third Amended Complaint ("Complaint") against Defendants City of Chicago ("the City") and Officers Luis Pelayo and Edgely Rife (collectively, "Officer Defendants"), hereby allege as follows:

**I.      NATURE OF THE ACTION**

      1.      This is a civil action seeking damages pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, for violations of Plaintiffs' rights protected by the Fourth and Fourteenth Amendments of the United States Constitution.

      2.      The violations, as further described below, relate to Officer Defendants' stop of Trevor Payton, their subsequent use of excessive force to restrain the Plaintiffs, their entry into and search of the Plaintiffs' home without a warrant, consent, or exigent circumstances, and entry into and search of Trevor Payton's vehicle without a warrant, consent, reasonable, articulable suspicion or probable cause.

## II.     JURISDICTION AND VENUE

3.     This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because this is a civil action arising under federal law, 42 U.S.C. § 1983, and the rights guaranteed by the United States Constitution.

4.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because these claims arise out of the same case or controversy as their federal claims.

5.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because Defendants are physically located in this judicial district and because the events giving rise to this action all occurred in this judicial district.

## III.    PARTIES

6.     Trevor Payton ("Trevor" or "Mr. Payton") is an individual who was born in 1981 and is a resident of the City of Chicago in Cook County, Illinois.  Mr. Payton is Black.

7.     Latasha Payton ("Latasha" or "Mrs. Payton") is an individual who was born in 1977 and is a resident of the City of Chicago, Cook County, Illinois.  Latasha Payton is Trevor Payton's wife.  Latasha Payton is Black.

8.     Teresa Payton ("Teresa" or "Ms. Payton") is an individual who was born in 2000 and is currently a resident of Des Moines, Polk County, Iowa.  At all times relevant to the Complaint, Teresa Payton was a resident of the City of Chicago, Cook County, Illinois.  Teresa Payton is the daughter of Trevor and Latasha Payton.  Teresa Payton is Black.

9.     Trevor Payton, Latasha Payton, and Teresa Payton lived together in the same household located at 10843 S. Hoxie Avenue, Chicago, Illinois 60617 at the time of the incident giving rise to this Complaint (the "Payton Residence").  Trevor and Latasha continue to live at the Payton Residence, while Teresa has moved to Iowa.

10. Officer Defendant Luis Pelayo is an individual who at all times relevant to this action was a police officer employed by the Chicago Police Department ("CPD") in the City of Chicago (Star No. 15276).

11. Office Defendant Edgely Rife is an individual who at all times relevant to this action was a police officer employed by the CPD in the City of Chicago (Star No. 18074).

12. Defendant City of Chicago (the "City") is an Illinois municipal corporation. The City is responsible for the acts of Officer Defendants while employed by the City and while acting within the scope of their employment.

13. In engaging in the misconduct alleged herein, each of the Officer Defendants acted under the color of authority and/or color of law and in the course of his employment by the City.

## IV. FACTUAL BACKGROUND

### A. Officer Defendants Stop Trevor Payton at his Home

14. On the afternoon of December 4, 2019, Trevor Payton was returning to the Payton Residence after helping his neighbors run errands. Just before he arrived at his house, Mr. Payton mistakenly drove the wrong way on 107th Avenue, which is a one-way street. Officer Defendants, who were on patrol in Mr. Payton's neighborhood, observed Mr. Payton driving the wrong way on 107th Avenue and followed Mr. Payton's vehicle to his home without activating their emergency lights.

15. After Mr. Payton parked and was stepping out of his vehicle, Officer Defendants activated their emergency lights and exited their own vehicle. Officer Defendants ordered Mr. Payton to return to his car.

16. Mr. Payton was confused by the Officer Defendants' command. Mr. Payton believed that he did not need to return to his vehicle because he already arrived at his home and

was walking to his front door. Mr. Payton asked Officer Defendants why he needed to return to his car.

17. Officer Defendants then approached Mr. Payton and, without explanation, aggressively attempted to physically restrain him and place him in handcuffs.

18. Officer Defendants did not tell Mr. Payton why they were attempting to restrain him, or tell him that he was being placed in handcuffs, was being detained, or that he was under arrest.

19. At this time, Teresa Payton, who was preparing to go to work and overheard the interaction, suspected that something was wrong and went outside to investigate.

20. Upon seeing Officer Defendants attempting to restrain Mr. Payton, Teresa asked Officer Defendants what her father did wrong. Officer Defendants ignored Teresa's request for explanation and continued to attempt to forcefully restrain Mr. Payton.

**B. Officer Defendants Enter Plaintiffs' Home to Seize Trevor Payton Without Consent, Without a Warrant, and Absent Exigent Circumstances.**

21. Mr. Payton moved away from Officer Defendants and entered the Payton Residence, while Officer Defendants followed him to the front door, pointing laser guns at him.

22. Frightened by Officer Defendants, Teresa likewise attempted to reenter the Payton Residence. However, Officer Defendants pushed her away from the front door, hitting her in the chest.

23. Mr. Payton attempted to close the front door, but Officer Defendants physically prevented Mr. Payton from closing the door, hit Mr. Payton in his neck, causing him to collapse, and pushed their way into Plaintiffs' house.

24. Officer Defendants did not request consent to enter Plaintiffs' home.

4

25.     No resident of, or person with apparent authority in, Plaintiffs' home gave any consent for Officer Defendants to enter the home.

26.     Officer Defendants did not announce their purpose when entering Plaintiffs' home.

27.     Officer Defendants tackled Mr. Payton inside the living room, at which time Latasha Payton, who was in bed grieving the recent passing of a relative, entered the living room and asked Officer Defendants to explain why they had entered the Payton Residence and restrained her husband.  Officer Defendants provided no such explanation.

28.     Teresa Payton also reentered the Payton Residence and told Officer Defendants to leave the house.  The Officer Defendants responded by pointing laser guns at her.

29.     While tackling Mr. Payton, Officer Defendants called for additional CPD units.

30.     Officer Defendants then dragged Mr. Payton outside the house, punched him in the ribs with handcuffs, and slammed him to the ground.  Mr. Payton hit his head against the concrete when Officer Defendants used excessive and unnecessary force to restrain him.

31.     Additional CPD officers arrived on scene, many of whom also piled on top of Mr. Payton.  In the process of handcuffing Mr. Payton, who was not resisting, CPD officers placed their knees on Mr. Payton's neck and back, leveraging their full body weight.[1]

32.     Mr. Payton suffered a wound to his forehead, ribs, and other body parts as a result of Officer Defendants violently removing him from his home and forcing him to the ground.

33.     Teresa asked again for Officer Defendants to explain their justification for arresting her father.  In response, either one Officer Defendant or an unknown CPD officer kicked Teresa.

---

[1] Pursuant to Federal Rule of Civil Procedure 15, Plaintiffs reserve the right to add additional CPD officers as defendants with respect to their own individual violations of Plaintiffs' rights when their identities are learned during the course of fact discovery.

34.     As a result of Officer Defendants' and other CPD officers' use of excessive force on Teresa and her father and mother, she later suffered an asthma attack and was taken to the emergency room for medical attention.

35.     Officer Defendants patted down Mr. Payton while he was handcuffed and felt an empty firearm holster on Mr. Payton's right hip.

**C.      Officer Defendants Detain Latasha Payton and Teresa Payton, Reenter the Payton Residence, and Search the Home Without Consent, Without a Warrant, and Absent Exigent Circumstances.**

36.     Around this time, Officer Defendants then *reentered* the Payton Residence—without a warrant and without consent—to search the home.

37.     Officer Defendants again failed to request consent or announce their purpose in reentering the Payton Residence.

38.     Latasha Payton attempted to block Officer Defendants' reentry into the Payton residence, communicating her lack of consent.  Instead, CPD officers physically yanked her from the threshold, with one unknown CPD officer telling her to "get the f**k out of the way."

39.     Either Officer Defendants or other CPD officers then placed Latasha and Teresa Payton in handcuffs without explanation or justification.

40.     Latasha informed the officers that their handcuffs were too tight and requested them to be loosened.  CPD officers verbally denied her request, which caused injuries to Latasha's and Teresa's wrists.

41.     Officer Defendants then—*after* entering Plaintiffs' home without a warrant and without consent—saw a protective vest in Plaintiffs' living room.  Upon further search of the other rooms in Plaintiffs' home, Officer Defendants found firearms and ammunition.

42.     During this time, Plaintiffs were forced to stand outside their home for an hour, handcuffed and in short sleeves in near-freezing weather.

6

**D.      Officer Defendants Search Trevor Payton's Vehicle Without Consent, a Warrant, Reasonable, Articulable Suspicion, or Probable Cause.**

43.      Officer Defendants entered and searched Mr. Payton's vehicle.

44.      Officer Defendants did not have a warrant or consent to search Mr. Payton's vehicle.

45.      At the time that Officer Defendants began searching Mr. Payton's vehicle, Officer Defendants did not have reasonable, articulable suspicion to believe that Mr. Payton's vehicle contained evidence of an offense.

46.      At the time that Officer Defendants began searching Mr. Payton's vehicle, Officer Defendants did not have probable cause that the search would uncover evidence of a crime.

47.      Officer Defendants recovered a handgun from Mr. Payton's vehicle.

**E.      Mr. Payton is Arrested.**

48.      Trevor Payton was arrested and charged with the Unlawful Use of a Weapon in violation of 720 ILCS 5/24-1.1 and Aggravated Battery of a Police Officer in violation of 720 ILCS 5/12-3.05.

49.      Mr. Payton was also ticketed for driving the wrong way on a one-way street with alley signs posted.

50.      All criminal charges against Mr. Payton were dropped as of February 28, 2024.

**F.      The City's Unlawful, Widespread Practices Regarding Illegal Search and Seizure and Excessive Force Were the Moving Force Behind Plaintiffs' Constitutional Deprivations.**

51.      At the time of the incident, widespread practices existed within the CPD where CPD officers executed unlawful searches and seizures and used excessive force.

52.     These widespread practices were so permanent and well-settled within the CPD that they constituted a custom or usage with the force of law and were the moving force behind Plaintiffs' constitutional deprivations and injuries.

53.     Examples below establish the widespread nature of these practices and the City's deliberate indifference towards them.

###### 1.     Unlawful Searches and Seizures.

54.     The Officer Defendants committed the unlawful searches and seizures at issue on December 4, 2019.

55.     From 2016 to 2019, the number of "Fourth Amendment/Improper Search [and Seizure]" allegations recorded by the Civilian Office of Police Accountability ("COPA") more than doubled each year.  Sydney R. Roberts, COPA Annual Report 2020, at 19 (Feb. 16, 2021) (the "2020 COPA Annual Report"), available at https://www.chicagocopa.org/wp-content/uploads/2021/02/2020-COPA-Annual-Report.pdf.

56.     The 2020 COPA Annual Report reveals that of the allegations reported that year, "2 in 4 allegations involved Fourth Amendment/Improper Search & Seizure."  *Id.*  An excerpt from the 2020 COPA Annual Report follows, highlighting supplied:

**Allegations by Category**

A single complaint may contain multiple allegations against one or more CPD members. In 2020, COPA recorded 3,504 allegations against CPD members, an 18% decrease over 2019 but a 45% increase over 2016. The most common allegations were fourth amendment/improper search and seizure, making up 50% of all allegations, followed by excessive force, making up 25% of all allegations in 2020. These categories were consistently the largest percentage of allegations in the last five years.

| Allegation Category | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Abuse of Authority | 2 | 7 | 9 | 29 | 17 |
| Coercion | 22 | 40 | 55 | 62 | 26 |
| Denial of Counsel | 0 | 4 | 7 | 5 | 20 |
| Domestic Violence | 58 | 58 | 81 | 111 | 77 |
| Excessive Force | 774 | 679 | 507 | 640 | 876 |
| Firearm Discharge at Animal | 35 | 24 | 22 | 16 | 11 |
| Firearm Discharge-Accidental | 5 | 3 | 3 | 15 | 6 |
| Firearm Discharge-Fatal | 18 | 8 | 6 | 5 | 7 |
| Firearm Discharge-Injury | 13 | 11 | 11 | 14 | 24 |
| Firearm Discharge-No Contact | 28 | 13 | 13 | 7 | 26 |
| Firearm Discharge-Officer Suicide | 1 | 2 | 3 | 3 | 2 |
| First Amendment | 3 | 0 | 31 | 5 | 7 |
| Fourth Amendment/Improper Search | 175 | 553 | 1019 | 2167 | 1744 |
| Incidents in Custody | 77 | 70 | 110 | 87 | 16 |
| Legal Violation | 0 | 19 | 27 | 23 | 12 |
| Miscellaneous | 123 | 83 | 111 | 10 | 0 |
| Miscellaneous Notification | 0 | 4 | 10 | 15 | 11 |
| OC Discharge | 21 | 24 | 2 | 3 | 4 |
| Operational Violation | 239 | 630 | 1063 | 664 | 361 |
| Proper Care | 7 | 5 | 9 | 18 | 0 |
| Rule 14 Violation | 19 | 81 | 58 | 32 | 6 |
| Sex Offense | 0 | 0 | 12 | 27 | 9 |
| Sexual Harassment | 0 | 0 | 0 | 16 | 13 |
| Taser Discharge | 441 | 253 | 9 | 7 | 9 |
| Traffic | 0 | 0 | 0 | 19 | 7 |
| Unnecessary Display of Weapon | 71 | 66 | 94 | 97 | 43 |
| Vehicle | 17 | 28 | 130 | 39 | 16 |
| Verbal Abuse | 272 | 241 | 254 | 174 | 154 |
| Total | 2421 | 2906 | 3656 | 4310 | 3504 |

*Allegations recorded under COPA jurisdiction by year (2016-2020)*

57.     The more than 100% increases of Fourth Amendment/Improper Search & Seizure allegations between 2016 – 2019 (with only a slight decrease in complaints during the pandemic year of 2020) are consistent with findings reported by the United States Department of Justice Civil Rights Division and the United States Attorney's Office for the Northern District of Illinois following an extensive investigation into the widespread, unconstitutional practices of the CPD. *See* U.S. Dep't of Just., *Investigation of the Chicago Police Department* (Jan. 13, 2017) (the "DOJ Report"), available at https://www.justice.gov/opa/file/925846/dl?inline.

58. The DOJ Report details numerous incidents in which the CPD officers aggressively sought opportunities to stop citizens, detain them, and perform illegal searches and seizures, particularly when, like here, the incident began as a traffic stop.

59. The DOJ Report finds that the CPD incentivizes a "tactical-oriented policing approach," saturating certain neighborhoods with specialized units to aggressively patrol perceived "hot spot[s.]" DOJ Report at 142. The result within the CPD is that assignment to such a unit effectively promotes members to a prestigious special status. *See id.* This creates an opportunity for career advancement within the CPD that rewards overenforcement: officers are selected for tactical teams based on "aggression, hustle, and effort"; aggressive officers "seek out crime between their radio assignments" and "hunt[] for offenders." *Id.*

60. The City's selection of neighborhoods that receive this type of "tactical-oriented policing" has resulted in the over-policing of Black individuals and Black communities. *Id.* at 15 ("CPD's pattern or practice of unreasonable force and systemic deficiencies fall heaviest on the predominantly black and Latino neighborhoods on the South and West Sides of Chicago, which are also experiencing higher crime. Raw statistics show that CPD uses force almost ten times more often against blacks than against whites. As a result, residents in black neighborhoods suffer more of the harms caused by breakdowns in uses of force, training, supervision, accountability, and community policing."). Even Black CPD officers are unable to avoid the presumption of unlawfulness that comes with being a Black individual living in neighborhoods where CPD officers are on the "hunt[] for offenders. *Id.* at 142. The DOJ Report includes a story from a Black CPD officer who was stopped *by his own Department* in one of these neighborhoods. *Id.* at 144. According to the officer, he has been "stopped many times by police in the Englewood neighborhood for no reason other than he is a black man in a nice car." *Id.*

61.    The mandates within the CPD to over-police these neighborhoods, and thus achieve personal career success was blatant.  At one meeting, officers were told to "go out and *make a lot of car stops* because vehicles are involved in shootings" without any discussion of whether such a tactic is an effective way to identify shooters, or of the negative impact such a tactic could have on police-community relations.  *Id.* at 142–43 (emphasis added).

62.    Chicago residents in certain neighborhoods reported a general sense that officers "patrol our streets like they are the dog catchers and we are the dogs." *Id.* at 143.  Residents also reported "being stopped and searched by police, handcuffed, and having background checks conducted before being let go, while doing everyday things like walking to the store."  *Id.* Residents also stated that programs designed to protect residents, like CPD's Roadside Safety Checks and DUI Saturation checks, "are conducted in ways that make the programs feel like *excuses to search residents and their cars*."  *Id.*  (emphasis added).

63.    The City uses this type of scattershot policing in the hopes that it turns up evidence or information related to more serious offenses for which the CPD would otherwise not have sufficient cause to pursue.  The DOJ Report also includes accounts of several individuals "being detained by CPD officers for low-level offenses (for example, failure to use a turn signal) or on false pretenses, [who were then] told that they would not be released until they brought the officers guns." *Id.* at 149.

64.    The examples in paragraphs 60 – 63 are just a few examples of the CPD's unlawful, unconstitutional conduct in carrying out searches and seizures, and the City's deliberate indifference to this unlawful pattern of misconduct.

65.    Against this backdrop, it is not surprising that victims of illegal searches and seizures file lawsuits every year complaining of CPD officer conduct and the City's complicity.

11

66.     In *Coleman v. City of Chicago et al.*, 2021-L-5001 (Cir. Ct. Cook Co., Ill.), the plaintiff—an off-duty, Black CPD officer—alleged that the CPD subjected him to false arrest, among other claims, arising out of an incident on May 14, 2020.  According to the complaint, the plaintiff was sitting outside of his home when five officers approached him.  The officers asked the plaintiff if he had heard any gunfire in the area, and the plaintiff responded, "no."  The officers then tackled and physically seized the plaintiff, pulling his arms behind his back and placing him in handcuffs.  Although the officers had no basis to detain the plaintiff, they continued to respond with unjustifiable aggression, grabbing the plaintiff by the arms, restraining him in a wrist lock, and then grabbing his waist and upper body and placing him in a chokehold.  Despite complaining the handcuffs were too tight, the officers refused to loosen them, causing the plaintiff to suffer physical injury.

67.     In *Brown v. City of Chicago et al.*, 21-cv-1397 (N.D. Ill.), a father and his two-year-old son alleged they were awoken by police officers on March 15, 2019.  According to the complaint, police officers surrounded their home before 6:00 a.m. and called them outside despite not being the target of the search warrant being executed, and despite there having been no legal or probable cause for defendants to have obtained a search warrant or to enter plaintiffs' residence.  Plaintiffs exited the home to officers "unreasonably . . . pointing guns" at them and subjecting them to an illegal seizure.  ECF No. 28, Compl., at ¶ 10, *Brown v. City of Chicago et al.*, 21-cv-1397 (N.D. Ill.).  Even though he was not the target of the search and had no connection to the alleged crime, the father was handcuffed in front of his son for at least 90 minutes in the near-freezing rain while the search took place.  *Id.* at 3–4.  CPD officers refused to allow the detained individuals to reenter the home to change the two-year old's soiled diaper, shouting obscenities and forcing them to remain outside in the cold.  *Id.* at 4.

68.     The above lawsuits filed against the City and the CPD officers it employs demonstrate that Plaintiffs' constitutional deprivations and injuries were part of a widespread practice of unconstitutionality in carrying out searches and seizures targeting Black people living in predominantly Black neighborhoods, executed by CPD officers and condoned by the City.  Like Mr. Payton, other Chicago residents have been subjected to illegal searches and seizures while going about daily activities or as a disproportionate and unjustifiable response to low-level traffic violations.  Like Trevor, Latasha, and Teresa Payton, CPD officers targeted Black Chicagoans using minor violations as a pretext for carrying out illegal searches of homes in predominantly Black neighborhoods.  And like Trevor, Latasha, and Teresa Payton, residents have been pulled from their homes without a warrant, assaulted, detained, and forced to stand handcuffed in the cold without regard to their health or wellbeing while police conducted illegal searches.

69.     It is also not surprising that Plaintiffs were the victims of an unconstitutional search and seizure in 2019, when the frequency of such incidents had almost quadrupled since 2017, and more than doubled since the year prior.  *See* 2020 COPA Annual Report at 19 (recording 2,167 reported instances of Fourth Amendment violations and improper searches in 2019 alone, as compared to 1,019 in 2018 and 553 in 2017).  These practices were not only widespread across the City of Chicago, but rapidly escalating at the same time that Plaintiffs were subjected to yet another illegal search and seizure.

70.     Despite the City's undeniable awareness of these types of incidents, the City has consistently failed to act in response to these repeated complaints of constitutional violations by its officers.

71.     The City failed to correct this conduct despite years of complaints and lawsuits alleging that its police officers are consistently and persistently conducting illegal searches and

seizures. In 2017 following the investigation that led to the DOJ Report, Attorney General Loretta Lynch commented "[o]ur investigation found that this pattern or practice is in no small part the result of severely deficient training procedures and accountability systems. [. . .] CPD does not give its officers the training they need to do their jobs safely, effectively, and lawfully." Loretta E. Lynch, U.S. Att'y Gen., *Attorney General Loretta E. Lynch Delivers Remarks at Press Conference on Investigation into Chicago Police Department* (Jan. 13. 2017), available at https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-remarks-press-conference-investigation-chicago); *see also* DOJ Report at 93–94 ("Our investigation revealed engrained deficiencies in the systems CPD uses to provide officers with supervision and training. CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result.").

72.     This deliberate indifference on the part of the City was the moving force behind Plaintiffs' injuries, as evidenced by the fact that Plaintiffs were targeted by police patrolling a predominantly Black neighborhood, who used a traffic violation as a pretext to execute a warrantless search, carried out with callous disregard for the safety and wellbeing of three Black individuals, all of which took place at the height of the CPD's shameful record of unconstitutional searches and seizures against Chicagoans. As such, Plaintiffs' *Monell* claims should proceed.

### 2. Excessive Force

73. The Officer Defendants used excessive force against Plaintiffs on December 4, 2019.

74. The 2020 COPA Annual Report reveals that from 2016 to 2019, the number of "Excessive Force" allegations against CPD officers ranged between 507 and 774. 2020 COPA Annual Report at 19. Combined with Fourth Amendment/Improper Search & Seizure, "Excessive Force" incidents made up 75% of the allegations against CPD officers in 2020. *Id.* An excerpt from the 2020 COPA Annual Report follows, highlighting supplied:

**Allegations by Category**

A single complaint may contain multiple allegations against one or more CPD members. In 2020, COPA recorded 3,504 allegations against CPD members, an 18% decrease over 2019 but a 45% increase over 2016. The most common allegations were fourth amendment/improper search and seizure, making up 50% of all allegations, followed by excessive force, making up 25% of all allegations in 2020. These categories were consistently the largest percentage of allegations in the last five years.

| Allegation Category | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Abuse of Authority | 2 | 7 | 9 | 29 | 17 |
| Coercion | 22 | 40 | 55 | 62 | 26 |
| Denial of Counsel | 0 | 4 | 7 | 5 | 20 |
| Domestic Violence | 58 | 58 | 81 | 111 | 77 |
| Excessive Force | 774 | 679 | 507 | 640 | 876 |
| Firearm Discharge at Animal | 35 | 24 | 22 | 16 | 11 |
| Firearm Discharge-Accidental | 5 | 3 | 3 | 15 | 6 |
| Firearm Discharge-Fatal | 18 | 8 | 6 | 5 | 7 |
| Firearm Discharge-Injury | 13 | 11 | 11 | 14 | 24 |
| Firearm Discharge-No Contact | 28 | 13 | 13 | 7 | 26 |
| Firearm Discharge-Officer Suicide | 1 | 2 | 3 | 3 | 2 |
| First Amendment | 3 | 0 | 31 | 5 | 7 |
| Fourth Amendment/Improper Search | 175 | 553 | 1019 | 2167 | 1744 |
| Incidents in Custody | 77 | 70 | 110 | 87 | 16 |
| Legal Violation | 0 | 19 | 27 | 23 | 12 |
| Miscellaneous | 123 | 83 | 111 | 10 | 0 |
| Miscellaneous Notification | 0 | 4 | 10 | 15 | 11 |
| OC Discharge | 21 | 24 | 2 | 3 | 4 |
| Operational Violation | 239 | 630 | 1063 | 664 | 361 |
| Proper Care | 7 | 5 | 9 | 18 | 0 |
| Rule 14 Violation | 19 | 81 | 58 | 32 | 6 |
| Sex Offense | 0 | 0 | 12 | 27 | 9 |
| Sexual Harassment | 0 | 0 | 0 | 16 | 13 |
| Taser Discharge | 441 | 253 | 9 | 7 | 9 |
| Traffic | 0 | 0 | 0 | 19 | 7 |
| Unnecessary Display of Weapon | 71 | 66 | 94 | 97 | 43 |
| Vehicle | 17 | 28 | 130 | 39 | 16 |
| Verbal Abuse | 272 | 241 | 254 | 174 | 154 |
| Total | 2421 | 2906 | 3656 | 4310 | 3504 |

*Allegations recorded under COPA jurisdiction by year (2016-2020)*

75.     The statistics reported by COPA are consistent with the DOJ Report's conclusion that the CPD "engages in a pattern or practice of unconstitutional use of force."  DOJ Report at 22.

76.     Per the DOJ Report, "[O]ur review of CPD records made clear that CPD's pattern of unreasonable force includes unreasonable less-lethal force."  *Id.* at 32.

77.     The DOJ Report explains that within the CPD, some officers "escalate encounters unnecessarily."  *Id.* at 33.  This includes incidents "in which CPD officers use retaliatory force against people who object and claim they were unlawfully stopped by CPD."  *Id.* at 33–34.

78.     In  one incident of excessive force described in the DOJ Report, officers stopped a man who was walking his dog without a leash.  *Id.* at 34.  The officers asked the man to present his identification, and when he refused, they handcuffed him.  *Id.*  Feeling the man stiffen his arms while being handcuffed—and without any further provocation—the officers responded by using "pain compliance techniques" to bring the man "forcibly to the ground."  *Id.*  The officers provided no justification for the level of force they used, nor did they explain why they made no attempt to resolve the situation with common de-escalation techniques.  *Id.*

79.     In yet another incident, a video of a traffic stop reviewed by the DOJ showed a woman exiting her car and placing her hands on her vehicle when "officers threw her to the ground, hit her, and deployed a Taser against her. The video indicates that the officer's claim that she had refused to show her hands, thus justifying the force used, was false."  *Id.* at 36.

80.     In March 2022, the Public Safety Section of the Chicago Office of the Inspector General evaluated race-based disparities in CPD's use of force.  *See* City of Chi. Off. of Inspector Gen., *Report on Race- and Ethnicity-Based Disparities in the Chicago Police Department's Use*

*of Force* (Mar. 1, 2022) ("OIG Report"), available at https://igchicago.org/wp-content/uploads/2022/02/Use-of-Force-Disparities-Report.pdf.

81.     The OIG Report found "*traffic and investigatory stops* make up a significant share of police encounters that result in reported police use of force." *Id.* at 17 (emphasis added). For the period between October 2017 and February 2020, "a total of 1,533 use-of-force subject-incidents were reported as occurring during an investigatory stop or a traffic stop," which accounts for 34% of the total number of use-of-force subject-incidents reported over that period. *Id.*

82.     The OIG Report explains that "Black people were far more likely to be stopped by the police than non-Black people in investigatory stops and traffic stops" and separately, "once stopped in an investigatory stop or traffic stop, Black people were more likely than non-Black people to face use of force. This result was also consistent across CPD Districts." *Id.* at 8.

83.     Further, "Black people were overrepresented—relative to their share of those stopped—in investigatory stops that lead to uses of force in 17 out of 22 CPD Districts (77%)." *Id.* at 36. For traffic stops specifically, "Black people were also overrepresented, relative to their share of those stopped, in traffic stops that lead to uses of force in all but one CPD District." *Id.*

84.     In 2019, the City of Chicago disclosed data about "Chicago Police Department Litigation." *See* City of Chicago's Report on Chicago Police Department Litigation (2019) (the "2019 CPD Litigation Report"), available at https://www.chicago.gov/content/dam/city/depts/dol/CPDLitigationReports/City%20of%20Chicago%20Report%20on%202019%20CPD%20Litigation.pdf.

85.     In 2019, the City settled 38 cases alleging use of excessive force; 32 cases alleging a false arrest; and 23 cases involving alleged illegal search and seizure. *Id.* at 3. In 2019 alone, the City paid more than $8 million for these settlements. *Id.*

86. The 2019 CPD Litigation Report notes it is the first of its kind and resulted from the 2019 Consent Decree, a federal court order that mandated broad CPD reform resulting from rampant policing failures and misconduct.

87. In the required "Analysis and Recommendations" section of the 2019 CPD Litigation Report, the City notes that that the 2019 settlements reflect litigation that arose prior to 2019 and "[t]his time lag, and changes made during the time lag, are significant factors confounding any analysis of whether the root causes (assuming they are within the CPD's power to address) of allegations shown to be accurate continue to exist to this day." *Id.* at 8.

88. The CPD Litigation Report says that even where meritorious claims "suggest taking certain risk management steps, such steps may be wholly or partly mooted by intervening reforms in policies, personnel, and operations." *Id.*

89. To any extent the City thought risk management steps were being "mooted" by intervening reforms after the Consent Decree in 2019, the City was wrong.

90. Despite the City's full knowledge of the DOJ Report, the Consent Decree, and its own reporting requirements, the widespread excessive force practices continued.

91. The 2022 CPD Litigation Report shows that at least 36 lawsuits alleging wrongful "Use of Force" had been filed based on underlying incident dates from 2019, 2020, or 2021: *Ball, Bavaro, Brady, Campbell, Carr, Carreto, Carson, Chavez, Coleman, Curtis, El Ro Al, Farris, Finnigan, Gens, Green, Hendrick, Hollis, Johnson, Keller, Kennedy, Koboyashi, Martin, McGee, Moaton, Morales, Nuckolls, Pena, Person, Reed, Sawyer, Thomas, Vassar, Williams, Wilson, Wright,* and *Yarbrough. See* City of Chicago's Report on Chicago Police Department Litigation at App'x A (2022), available at

https://www.chicago.gov/content/dam/city/depts/dol/CPDLitigationReports/City%20of%20Chicago%20Report%20on%202022%20CPD%20Litigation.pdf. This list includes cases the City settled. There are additional "Use of Force" lawsuits arising from 2019-2021 conduct in Appendix B for litigated matters.

92. The above demonstrates the Plaintiffs were not alone in suffering constitutional injuries, but that they instead suffered injuries consistent with those of many others that resulted from a widespread practice of using excessive force by CPD officers.

93. The City is well aware that a widespread practice exists where CPD officers use illegal excessive force.

94. Like the incident at the Payton Residence on December 4, 2019, the statistics and examples above demonstrate that CPD officers unnecessarily escalate situations and use excessive force when it is unwarranted and prohibited by the Constitution, and disproportionately use such excessive force in Black neighborhoods and on Black residents.

95. As set forth above, Mr. Payton was stopped outside of his home on the premise of a vehicle stop, after the Officer Defendants had followed him for several miles. Mr. Payton asked Officer Defendants why he needed to return to his vehicle, which he had already parked outside of his home. In response to this simple question, the Officer Defendants unnecessarily and illegally escalated the situation. Without justification or proper cause, Officer Defendants restrained, detained, arrested, and injured Mr. Payton, and injured and detained his wife and daughter during the process as well. This excessive use of force and escalation without cause is unsurprisingly the exact same as the many other incidents reported by the 2022 CPD Litigation Report for the same relevant time period.

96.     The City fails to correct this conduct despite years of complaints and lawsuits alleging that its police officers are consistently and persistently using excessive force, as evidenced by the lack of cognizable improvement between the 2019 and 2022 CPD Litigation Reports. *See supra* at ¶¶ 84–91.

97.     The City's deliberate indifference, and failure to address the well-known and widespread use of excessive force amongst its police officers, was the moving force behind Plaintiffs' injuries and permits Plaintiffs' *Monell* claims to proceed.

## V.     CAUSES OF ACTION

### Count I: 42 U.S.C. § 1983 Against All Officer Defendants — Unlawful Seizure of Trevor Payton's Person

98.     Mr. Payton hereby incorporates all of the preceding paragraphs as though fully set forth in this Count.

99.     Officer Defendants unlawfully seized Mr. Payton when they forced their way into Plaintiffs' home without a warrant, without consent, and absent exigent circumstances, and physically forced him out of his home, threw him to the ground, and arrested him.

100.     This use of force by Officer Defendants was unreasonable and unjustified by any conduct leading up to and during Officer Defendants' entry into Plaintiffs' home.

101.     The actions of Officer Defendants in entering Plaintiffs' home and forcibly bringing Mr. Payton outside were willful, malicious, and/or done with reckless indifference and callous disregard for Mr. Payton's rights, amounting to an abuse of power that shocks the conscience.

102.     Officer Defendants acted under color of law when they unlawfully seized Mr. Payton.

103.     As a result of Officer Defendants' seizure of Mr. Payton, Mr. Payton sustained physical injuries as well as emotional damages and suffering.

**<u>Count II: 42 U.S.C. § 1983 Against All Officer Defendants —<br>Unlawful Seizure of Latasha Payton's Person</u>**

104.     Latasha Payton hereby incorporates all of the preceding paragraphs as though fully set forth in this Count.

105.     Officer Defendants and other CPD officers unlawfully seized Latasha Payton when they handcuffed and detained her for an hour to search Plaintiffs' home without a warrant, without consent, and absent exigent circumstances.

106.     At the time that Officer Defendants and other CPD officers seized Latasha Payton, officers did not have probable cause or reasonable, articulable suspicion to believe that she had committed an arrestable offense.

107.     This forceful seizure by Officer Defendants and other CPD officers was unreasonable and unjustified by any conduct leading up to and during the Officer Defendants' and other CPD officers' reentry into Plaintiffs' home.

108.     The actions of Officer Defendants and other CPD officers in forcibly removing Latasha Payton from Plaintiffs' home and aggressively detaining her to conduct an hour-long warrantless search of the home were willful, malicious, and/or done with reckless indifference and callous disregard for Latasha Payton's rights, amounting to an abuse of power that shocks the conscience.

109.     Officer Defendants and other CPD officers acted under color of law when they unlawfully seized Latasha Payton.

110.     As a result of the Officer Defendants' and other CPD officers' seizures, Latasha Payton sustained physical injuries as well as emotional damages and suffering.

**Count III:  42 U.S.C. § 1983 Against All Officer Defendants —**
**Unlawful Seizure of Teresa Payton's Person**

111.    Teresa Payton hereby incorporates all of the preceding paragraphs as though fully set forth in this Count.

112.    Officer Defendants and other CPD officers unlawfully seized Teresa Payton when they handcuffed and detained her for an hour to search Plaintiffs' home without a warrant, without consent, and absent exigent circumstances.

113.    At the time that Officer Defendants and other CPD officers seized Teresa Payton, officers did not have probable cause or reasonable, articulable suspicion to believe that she had committed an arrestable offense.

114.    This forceful seizure by Officer Defendants and other CPD officers was unreasonable and unjustified by any conduct leading up to and during the Officer Defendants' and other CPD officers' reentry into Plaintiffs' home.

115.    The actions of Officer Defendants and other CPD officers in forcibly removing Teresa Payton from Plaintiffs' home and aggressively detaining her to conduct an hour-long warrantless search of the home were willful, malicious, and/or done with reckless indifference and callous disregard for Teresa Payton's rights, amounting to an abuse of power that shocks the conscience.

116.    Officer Defendants and other CPD officers acted under color of law when they unlawfully seized Teresa Payton.

117.    As a result of the Officer Defendants' and other CPD officers' seizures, Teresa Payton sustained physical injuries as well as emotional damages and suffering.

## Count IV: 42 U.S.C. § 1983 Against All Officer Defendants — Excessive Force

118.     Plaintiffs hereby incorporate all of the preceding paragraphs as though fully set forth in this Count.

119.     Officer Defendants inflicted violence upon Trevor Payton when they struck him in the neck, forced him out of his home, punched him with handcuffs, threw him to the ground, and pinned him with knees on his neck.

120.     Officer Defendants and/or other CPD officers inflicted violence upon Latasha Payton when they forcibly yanked her from her home and restrained her with unnecessarily tight handcuffs.

121.     Officer Defendants and/or other CPD officers inflicted violence upon Teresa Payton when they hit her in the chest, kicked her, and forcibly restrained her with unnecessarily tight handcuffs.

122.     This use of force by Officer Defendants and other CPD officers was excessive, unnecessary, and grossly disproportionate to the need for action under the circumstances.

123.     The actions of Officer Defendants and other CPD officers in inflicting violence on Plaintiffs were willful, malicious, and/or done with reckless indifference and callous disregard for Plaintiffs' rights, amounting to an abuse of power that shocks the conscience.

124.     Officer Defendants and other CPD officers acted under color of law when they inflicted this violence on Plaintiffs.

125.     As a result of Officer Defendants' and other CPD officers' excessive force inflicted on Plaintiffs, Plaintiffs sustained physical injuries as well as emotional damages and suffering.

## Count V: 42 U.S.C. § 1983 Against All Officer Defendants — Unlawful Search of Plaintiffs' Home

126.    Plaintiffs hereby incorporate all of the preceding paragraphs as though fully set forth in this Count.

127.    Officer Defendants and other CPD officers violated Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments by entering Plaintiffs' home without a warrant, without consent, absent exigent circumstances, and absent an emergency.

128.    Officer Defendants *twice* entered Plaintiffs' home in violation of their constitutional rights.

129.    First, Officer Defendants pushed their way inside the home without even attempting to secure a search warrant or elicit consent.  As a result of Officer Defendants' unlawful and unreasonable entry into Plaintiffs' home, Teresa Payton was hit and kicked, and Trevor Payton was violently forced out of his house and thrown to the ground.

130.    Second, Officer Defendants and other CPD officers reentered Plaintiffs' home to conduct a search without a warrant and without consent.  For the search's approximate hour-long duration, Latasha Payton and Teresa Payton were forcibly detained, resulting in further injury.

131.    Officer Defendants' and other CPD officers' searches of Plaintiffs' home were unreasonable.

132.    Officer Defendants and other CPD officers were acting under color of state law when they unlawfully entered and searched Plaintiffs' home.

133.    As a result of this unlawful search, Plaintiffs suffered and continue to suffer emotional pain and humiliation, shame, and frustration at having Officer Defendants and other CPD officers unreasonably invade their private lives.

24

### Count VI: 42 U.S.C. § 1983 Against All Officer Defendants —
### Unlawful Search of Trevor Payton's Vehicle

134. Mr. Payton hereby incorporates all of the preceding paragraphs as though fully set forth in this Count.

135. Officer Defendants violated Mr. Payton's constitutional rights under the Fourth and Fourteenth Amendments by searching his vehicle without a warrant, without consent, without reasonable, articulable suspicion of an offense of arrest, and without probable cause.

136. Officer Defendants' search of Mr. Payton's vehicle was unreasonable and unjustified by the circumstances leading to or surrounding the search.

137. Officer Defendants were acting under the color of law when they unlawfully and unreasonably searched Mr. Payton's vehicle.

138. As a result of this unlawful search, Mr. Payton has suffered and continues to suffer emotional pain and humiliation, shame, and frustration at having Officer Defendants unreasonably invade his private life.

### Count VII: 42 U.S.C. § 1983 (*Monell* Claim) Against the City —
### CPD's Unlawful Custom of Warrantless Seizures

139. Plaintiffs hereby incorporate all of the preceding paragraphs as though fully set forth in this Count.

140. Entering Plaintiffs' home to effect Trevor Payton's warrantless arrest violated his Fourth Amendment rights.

141. Seizing Latasha Payton to conduct a prolonged, warrantless search of Plaintiffs' home violated her Fourth Amendment rights.

142. Seizing Teresa Payton to conduct a prolonged, warrantless search of Plaintiffs' home violated her Fourth Amendment rights.

143.     At the time, and as documented by the allegations above, the DOJ Report, the 2020 COPA Annual Report, the OIG Report, the 2019 CPD Litigation Report, and the 2022 CPD Litigation Report, the CPD had a custom of escalating encounters unnecessarily and conducting warrantless, illegal searches and seizures in the wake that followed.

144.     This custom was persistent and widespread in December 2019.

145.     The above widespread practices were allowed to flourish as demonstrated by the City's failure to correct this conduct despite years of complaints and lawsuits alleging that its police officers were and are consistently and persistently conducting illegal searches and seizures.

146.     The widespread practice of performing illegal, warrantless searches and seizures was the moving force behind the Officer Defendants' unlawful searches and seizures against Plaintiffs and thus the moving force behind the violations of Plaintiffs' constitutional rights.  Based upon the principles set forth in *Monell v. Dep't of Soc. Servs. of the City of New York et al.*, 436 U.S. 658 (1978), the City is liable for the harm done to Plaintiffs as set forth above.

### Count VIII: 42 U.S.C. § 1983 (*Monell* Claim) Against the City — CPD's Unlawful Custom of Excessive Force

147.     Plaintiffs hereby incorporate all of the preceding paragraphs as though fully set forth in this Count.

148.     Officer Defendants and other CPD officers used excessive force against Plaintiffs to seize Trevor Payton, detain Latasha Payton and Teresa Payton, and search Plaintiffs' home, all in violation of their Fourth Amendment rights.

149.     At the time, and as documented by the allegations above, the DOJ Report, the 2020 COPA Annual Report, the OIG Report, the 2019 CPD Litigation Report, and the 2022 CPD Litigation Report, CPD had a custom of escalating encounters unnecessarily and using excessive force in the wake that followed.

26

150. This custom was persistent and widespread in December 2019.

151. The above widespread practices were allowed to flourish as demonstrated by the City's failure to correct this conduct despite years of complaints and lawsuits alleging that its police officers were and are consistently and persistently using excessive force.

152. The widespread practice of using excessive force was the moving force behind the Officer Defendants' use of excessive force against Plaintiffs and thus the moving force behind the violations of Plaintiffs' constitutional rights. Based upon the principles set forth in *Monell v. Dep't of Soc. Servs. of the City of New York et al.*, 436 U.S. 658 (1978), the City is liable for the harm done to Plaintiffs as set forth above.

### Count IX: 42 U.S.C. § 1983 (*Monell* Claim) Against the City — CPD's Unlawful Custom of Unlawful Searches

153. Plaintiffs hereby incorporate all of the preceding paragraphs as though fully set forth in this Count.

154. Officer Defendants and other CPD officers entering Plaintiffs' home repeatedly to conduct searches without a warrant, consent, or exigent circumstances violated Plaintiffs' Fourth Amendment rights.

155. At the time, and as documented by the allegations above, the DOJ Report, the 2020 COPA Annual Report, the OIG Report, the 2019 CPD Litigation Report, and the 2022 CPD Litigation Report, CPD had a custom of escalating encounters unnecessarily and conducting warrantless, illegal searches and seizures in the wake that followed.

156. This custom was persistent and widespread in December 2019.

157. The above widespread practices were allowed to flourish as demonstrated by the City's failure to correct this conduct despite years of complaints and lawsuits alleging that its police officers were and are consistently and persistently conducting illegal searches and seizures.

158.    The widespread practice of performing illegal, warrantless searches and seizures was the moving force behind the Officer Defendants' unlawful searches and seizures against Plaintiffs and thus the moving force behind the violations of Plaintiffs' constitutional rights.  Based upon the principles set forth in *Monell v. Dep't of Soc. Servs. of the City of New York et al.*, 436 U.S. 658 (1978), the City is liable for the harm done to Plaintiffs as set forth above.

### Count X: State Law Claim Against the City — 745 ILCS 10/9-102 for Payment of Judgment and Indemnification

159.    Plaintiffs hereby incorporate all of the preceding paragraphs as though fully set forth in this Count.

160.    As described herein, Officer Defendants unlawfully searched Plaintiffs' home, unlawfully searched Mr. Payton's vehicle, unlawfully seized Plaintiffs' persons, and used unreasonable, excessive force when they conducted such seizures.

161.    At all times relevant to this Complaint, the City was the employer of Officer Defendants.

162.    At all times relevant to this Complaint, Officer Defendants acted under color of state law and in the scope of their employment as employees of the City, and specifically, as law enforcement officers in CPD.

163.    Section 9-102 of the Local Government and Governmental Employees Tort Immunity Act, 745 ILCS 10/9-102, provides in relevant parts, as follows:

A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article . . . .

164.     Pursuant to Section 9-102, the City is liable for and required to pay any judgment entered against Officer Defendants on Counts I-VI hereof for compensatory damages, attorneys' fees, costs, and interest, and, therefore, Plaintiffs seek judgment against the City accordingly.

## VI.    PRAYER FOR RELIEF

165.     Plaintiffs demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

166.     WHEREFORE, Plaintiffs pray for entry of judgment on Counts I-VI against Defendants Luis Pelayo and Edgely Rife in an amount to be proven at trial for compensatory damages, punitive damages, reasonable attorneys' fees, costs, and interest, and on Counts VII-X against the City in an amount to be proven at trial for compensatory damages, reasonable attorneys' fees, costs, and interest, and for such other relief as the Court may deem appropriate.


November 15, 2024

                                        Respectfully submitted,

                                        LATHAM & WATKINS LLP

                                        By: */s/ Terra Reynolds*
                                        Terra Reynolds (ARDC No. 6278858)
                                        Terra.Reynolds@lw.com
                                        Meredith Monroe (ARDC No. 6302558)
                                        Meredith.Monroe@lw.com
                                        Kathleen Ryan (ARDC No. 6333276)
                                        Kathleen.Ryan@lw.com
                                        Jaime Zucker (ARDC No. 6333596)
                                        Jaime.Zucker@lw.com
                                        LATHAM & WATKINS LLP
                                        330 North Wabash Avenue, Suite 2800
                                        Chicago, Illinois 60611
                                        Telephone: (312) 876-7700
                                        Facsimile: (312) 993-9767

                                        Claire McKeown (admitted Pro Hac Vice)
                                        Claire.McKeown@lw.com

LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Facsimile: (858) 523-5450

Parvuna Sulaiman (admitted Pro Hac Vice)
Parvuna.Sulaiman@lw.com
Darya Tahan (admitted Pro Hac Vice)
Darya.Tahan@lw.com
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200

*Attorneys for Plaintiffs Trevor Payton, Latasha Payton, and Teresa Payton*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing was served electronically through this Court's electronic service system upon all parties and/or counsel of record on November 15, 2024. Notice of this filing is sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Terra Reynolds*
Terra Reynolds
